

**SO ORDERED.**

**SIGNED this 02 day of October, 2006.**

_____
**JAMES D. WALKER, JR.**
**UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | CASE NO. 05-11683-JDW |
| BRINSON AND SANDRA CLEGG, | ) | |
| | ) | |
| DEBTORS. | ) | |
| | ) | |
| FRANKIE LUKE, | ) | ADVERSARY PROCEEDING |
| | ) | NO. 05-1045 |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| BRINSON AND SANDRA CLEGG, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

BEFORE

JAMES D. WALKER, JR.

UNITED STATES BANKRUPTCY JUDGE

<u>COUNSEL</u>

For Plaintiff:        T. Lee Bishop, Jr.
                       Post Office Box 1791
                       Albany, Georgia 31702-1791

For Defendants:      Greg A. Clark
                       Post Office Box 605
                       Albany, Georgia 31702

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiff Frankie Luke's complaint objecting to

discharge.  This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(J).  After

considering the pleadings, the evidence, and the applicable authorities, the Court enters the

following findings of fact and conclusions of law in conformance with Federal Rule of

Bankruptcy Procedure 7052.

### Findings of Fact

### BACKGROUND

In September 2003, Debtor-Defendants Sandra and Brinson Clegg obtained a loan from

Security Bank and Trust Company of Albany to buy an existing hair salon known as the Hair

Force.  Neither Defendant had any business experience, nor had either one finished high school.

However, Defendant-wife had earned a G.E.D. and was trained in cosmetology.  Defendants

borrowed approximately $50,000 from Security Bank.  Of that, about $40,000 was used to

purchase the business, which included existing equipment and decor, such as carts, mirrors,

sinks, chairs, and a cash register.  The remaining $10,000 was used to purchase additional

equipment, supplies, and inventory, and to create Cowlicks and Pigtails, which was a section of

the salon designed for children.  Plaintiff Frankie Luke, who is Defendant-wife's mother, offered

her home as collateral for the loan.

Defendant-husband was not involved in the day-to-day operations of the business.  He

helped set up Cowlicks and Pigtails, and occasionally signed checks, but Defendant-wife was the

primary proprietor.  Defendants hired Plaintiff to work at the salon as a receptionist/bookkeeper

for $300 per week.  She had full access to the business bank account, enabling her to sign checks and make deposits.  Plaintiff understood that her employment would continue until the lien against her house was released.  In addition, Defendant-wife hired stylists to work at the salon on a commission basis.

According to Plaintiff, while she was employed at the Hair Force, the business kept detailed records.  With regard to inventory and supplies, as invoices came in, they were checked off against the shipments they came with and filed in a separate folder for each supplier.  Outgoing expenses were tracked through the checkbook stubs and register.  The stubs showed the corresponding invoice number for each bill paid, the payee, the purpose of the payment, and the date.  The checkbook register contained similar information in greater detail.  In addition, the appointment book listed each stylist's clients for the day, the services rendered (which enabled the business to determine how much product, if any, was used), method of payment, and product purchased.  It also showed whether the stylist took any product, such as hair dye, for personal use.  Based on the figures in the appointment book, each stylist received 60% of the income she generated.  The business also kept cash register tapes that could be used to track all money coming into the salon.

In late January 2004, Defendant-husband fired Plaintiff.  Defendant-wife testified that she continued to keep the same business records after Plaintiff left.

Sometime during 2004, Defendant-wife decided to change the name of the salon to Paradygm and move it to a new location.  However, the relocated venture never got off the ground.  On October 28, 2004, Security Bank sent Defendant-husband a letter notifying him that the business loan was in default, and three days later, on October 31, Defendant-wife ceased

4

business operations.  Defendant-husband helped move some of the salon equipment and records

to Defendants' mobile home.

In addition to the business failing, Defendants' marriage began failing in the fall of 2004,

and they were struggling financially.  In October, Defendant-husband sold a rifle to a friend for

$150 to pay living expenses.  In early November, their mortgage company notified Defendants of

a default on payments for the mobile home.  By Christmas, Defendants had separated, with

Defendant-husband and Defendants' daughter moving out of the mobile home.[1]  According to

Defendant-husband, he was not yet contemplating bankruptcy.

At some point after the salon closed, Defendant-wife moved some of the business

equipment and records to a shed on her friend, Haley Nichols', property.  This included two

filing cabinets that contained business records such as the invoices and cash register tapes.  The

appointment book remained at the mobile home.

In January 2005, Nancy Jones–Plaintiff's mother and Defendant-wife's

grandmother–offered Defendant-wife free use of a 10-by-20-foot unit at Malone Storage, which

was owned by Ms. Jones.  Defendant-wife stored some personal odds and ends, but she also

allowed her friends April and Matt Trice to store their belongings in the unit.  No items from the

salon were stored there.

About two months later, in March 2005, Ms. Jones learned that the unit was primarily full

of the Trice's property.  She locked them out of the unit until they agreed to pay for its use.

Shortly thereafter, Ms. Jones received a check from Mr. Trice, and he removed all his property.

---

[1] In August 2006, shortly before the trial in this case, Brent Clegg filed a petition for
divorce from Sandra Clegg.

At that time, Ms. Jones ceased making the unit available to Defendant-wife.

About this time, the electricity to the mobile home was turned off, and Defendant-wife moved out, leaving some business assets and records in the mobile home.  She had no place to stay and mainly relied on friends to shelter her.  When she returned to the mobile home prior to April 2005, she discovered that the locks had been changed, and she was unable to enter.  Mr. Dixon, the manager of the mobile home park, told her she was trespassing.

On May 9, 2005, a Writ of Possession was entered in Lee County Superior Court allowing the mortgage company to repossess the mobile home.  Defendant-wife learned of the pending repossession in June 2005, while she was staying with friends in Jacksonville, Florida. She did not contact the mortgage company about retrieving her property from the mobile home although she did send it a letter stating she would not contest the repossession.  Defendant-wife later learned through friends of her daughter that prior to the repossession Mr. Dixon had removed her property from the mobile home and set it along the side of the road.  The exact date of repossession is not known, but at the time of repossession, business assets and records stored in the mobile home, that may have been removed by Mr. Dixon, included mannequin heads, racks, framed art, Lisa Lanier paintings, cleaning supplies, office supplies, styling books, a shampoo bowl, a chair, anti-fatigue maps, and the appointment book.

In June 2005, Ms. Jones loaned Defendant-husband $170.  She offered it as a gift, but he declined, telling her that he would repay it.  Defendant-husband testified that he felt morally obligated to pay back the money.

Shortly thereafter, Defendant-husband borrowed $850 from his boss to hire a bankruptcy attorney.  Defendants filled out their bankruptcy petition and schedules in a conference room in

their attorney's office.  The attorney was available to answer their questions, but he did not

explain each item of the petition and schedules as Defendants filled them out.  On August 10,

2005, Defendants filed a joint Chapter 7 petition.

On the filing date, Defendant-husband did not have possession of any salon property

except a stackable washer and dryer, and he did not know the whereabouts of any other business

property or records.  Defendant-wife also had no salon property in her possession on the petition

date.  She was not even sure where all the business assets and records were located, although she

was aware that most of the equipment was stored in Ms. Nichols' shed.  At that time, Defendant-

wife and Ms. Nichols were on good terms.

On August 13, 2005, Defendant-husband rented a 10-by-10-foot self-storage unit, which

he used to store his and his daughter's belongings.  Their property completely filled the unit, so

there would have been no room to store any salon assets.

Defendants sat for a Rule 2004 examination on October 13, 2005, at which time they

were alerted to errors and omissions in their bankruptcy schedules.  About this time, Defendant-

wife began attempting to recover the salon property and records from Ms. Nichols, but her

friendship with Ms. Nichols had deteriorated.  Although she left messages on Ms. Nichols' cell

phone and attempted to contact her at work, Defendant-wife was unable to reach Ms. Nichols and

was unable to access the shed in which the salon property and records were stored.

In October 2005, Ms. Nichols told Plaintiff that her father was going to file a lawsuit

against Defendant-wife if Defendant-wife did not remove her possessions from a trailer on his

property.  The trailer and the shed in which the salon equipment was stored were on the same

property.  Plaintiff did not know how to contact Defendant-wife, but she did try to call

Defendant-husband.  However, his home phone and his parents' phone were both disconnected.

Consequently, Plaintiff went to the trailer and removed the items that Ms. Nichols pointed out as

Defendant-wife's.  They were mostly personal property, such as old clothes, a nonworking

computer, household decor, and a mattress.  Plaintiff saw no salon equipment or records, nor did

she enter the shed.

With the foreclosure on her house looming due to Defendants' default on the Security

Bank loan, Plaintiff sold her house to Ms. Jones on October 20, 2005.  She used the proceeds to

buy Defendants' note from the bank on October 25, 2005.

On November 14, 2005, Plaintiff filed a complaint objecting to discharge pursuant to 11

U.S.C. § 727(a)(2), (a)(3), (a)(4), and (a)(5).  In the alternative, Plaintiff sought a determination

of nondischargeability with respect to the amount owed on the note.  Plaintiff did not pursue the

dischargeability claim, and the Court deems it abandoned.  On April 17, 2006, Plaintiff filed a

motion for partial summary judgment, which the Court denied.  On August 10, 2006, the Court

held a trial in the case.

ERRORS AND OMISSIONS IN THE BANKRUPTCY SCHEDULES

During the trial, Plaintiff pointed to a number of errors and omissions in Defendants'

schedules, including amended Schedules B and C filed on December 2, 2005, and an amended

Statement of Financial Affairs filed on May 11, 2006.  Defendants testified that they believed

their schedules to be true and accurate at the time of filing.  After they were alerted to the

problems, they believed the amendments fully cured any defects.

With respect to creditors, Defendants failed to list the $170 loan from Ms. Jones to

Defendant-husband and the $850 loan from Defendant-husband's boss, which was repaid

8

postpetition.  Defendants did not explain why they failed to list Ms. Jones' loan.  However,

Defendant-husband testified that he did not list his boss's loan because there was no written

contract and he considered it a mere favor.

Plaintiff contended that several pieces of personal property were omitted from Schedule

B, including a digital camera, a Playstation game console, a camcorder, and a go-cart.

Defendant-husband testified that although the items were not individually listed, they fell within

the scope of miscellaneous hobby items and miscellaneous recreation supplies, which were both

listed as descriptions of property.  Furthermore, the Playstation belonged to his daughter.

Defendant-wife testified that she had wrecked the go-cart, and it was unusable.  In addition,

Defendants owned four computers, but only three were listed.  Defendant-wife testified that the

fourth was not listed because it was not in use on the petition date.  Finally, management

software that had been purchased for the salon and installed on one of the computers was unlisted

because Defendants considered it a part of the computer, Defendant-wife said.

Errors in the Statement of Financial Affairs ("SOFA") were the most numerous,

according to Plaintiff.  In both the original and amended SOFA, under item 1 Defendants

indicated that Defendant-wife had $0 gross income for 2004 and $21,000 for 2003.  However,

her 2004 tax return, Schedule C (profit or loss from business), shows gross receipts of $113,086.

Her Schedule C for 2003 shows gross receipts of $37,627.  Defendant-wife explained the

discrepancies by stating that the tax returns represented the hair salon's income, not her income.

Her testimony demonstrated that she does not understand that income to a sole proprietorship is

the business owner's income.

Under item 8 of the original SOFA, Defendants did not list any losses from fire, theft or

9

casualty in the year preceding the bankruptcy filing.  They corrected this in their amended SOFA, stating that Paradygm had been burglarized in October 2004 and the mobile home had been repossessed on an unknown date while it contained business and personal property.

Although both the original and amended SOFA report in item 9 that Defendants paid their bankruptcy attorney $1,000, neither SOFA gives the date of the payment.

In the original SOFA, under item 10, Defendants listed no transfers of property occurring during the year preceding the filing.  On an amended SOFA, Defendants listed three transfers, including the sale of three guns to Chris Scott for $550 in October 2004.  However, they did not list a fourth gun sold by Defendant-husband to a man named Linwood, whose last name is unknown, for $150.  Defendant-husband testified that he did not originally list the sales because he understood property to mean items such as land, houses, and businesses.  He did not explain why the amended SOFA listed the sale of guns to Chris Scott but not to Linwood.

Item 15 of the original SOFA indicated that Defendants had not moved during the two years prior to filing on August 10, 2005.  In the amended SOFA, the lookback period was three years.  However, in December 2004, Defendant-husband moved out of the mobile home.  By spring of 2005, Defendant-wife also had moved out of the mobile home.  Thus, both Defendants changed addresses at least once in the two years preceding commencement of their case. Furthermore, Defendant-wife testified that she was virtually homeless, staying with a series of friends, from the time she left the mobile home until she rented an apartment for herself in February 2006.

In item 18 of both SOFAs, Defendants gave the same address for the Hair Force and Paradygm.  However, Defendant-wife testified that Paradygm was the same business with a

10

different name and a different location.  She did not explain why the SOFA reflected an incorrect

address for Paradygm.

In the original SOFA, Defendants provided an incomplete list of the people who had kept

or supervised business records in item 19.  They expanded the list on the amended SOFA and

added an explanation that some records had been stored in the repossessed mobile home and

others had been stored with a former friend (Ms. Nichols) who could not be located.

Finally, in item 20b on both SOFAs, Defendants failed to list the location or custodian of

business records and inventory.

## MISSING BUSINESS RECORDS

Plaintiff testified about the various records kept by the hair salon while she was employed

there.  Defendant-wife testified that after Plaintiff was fired, she continued to keep the same type

of records.  These included invoices for the purchase of equipment, supplies, and inventory,

appointment books, check stubs, checkbook register, bank statements, and cash register tapes.

Defendants have been unable to produce these records.  Plaintiff testified that the financial

condition of the hair salon could only be determined by reference to the missing records.

According to Defendant-wife, the appointment book was stored in her mobile home, and

the remaining records were in a filing cabinet stored in a shed on Ms. Nichols' property.  The

appointment book was lost when the mobile home was repossessed.  Because Defendant-wife's

friendship with Ms. Nichols has soured since the bankruptcy filing, she has been unable to

retrieve the other records.  Defendant-wife testified that she never intended to lose any records

and that she attempted to keep them as long as she could.

11

**Conclusions of Law**

STANDING

At issue in this case is whether Defendants should be denied a discharge under 11 U.S.C.

§ 727(a).  Before addressing the question of discharge, the Court will consider whether Plaintiff

has standing to bring this complaint.  "The trustee, a creditor, or the United States trustee may

object to the granting of a discharge under subsection (a) of this section."  11 U.S.C. § 727(c)(1).

Therefore, Plaintiff has standing if she is a creditor of Defendants.  A creditor must hold a pre-

petition claim.  Id. § 101(10)(A).  In this case the debt arose prepetition, but Plaintiff acquired it

by assignment after Defendants filed their petition.

The court in Young v. Beugen (In re Beugen), 99 B.R. 961 (B.A.P. 9th Cir. 1989), also

faced a § 727(a) objection from a creditor who had purchased a claim postpetition, but under

very different circumstances.  In that case, Young had purchased a business from the debtor.  The

transaction spawned 18 lawsuits in state and federal court, almost all of which were initiated by

Young, who the court described as a "vexatious litigant."  Id. at 961-62.  After the debtor and his

business filed separate Chapter 11 cases, Young purchased an unsecured claim in each case.  The

business case was later dismissed, and the debtor's individual case was converted to Chapter 7.

Id. at 962.  Young filed a complaint for denial of discharge under multiple subsections of §

727(a), which the bankruptcy court dismissed with prejudice due to lack of standing.  Id. at 962-

63.  The B.A.P. affirmed.  It agreed with the bankruptcy court that Young was "attempting to use

the Court as a whipping post to inflict punishment on the [debtor]" and that the "right to object to

a debtor's discharge is not a marketable commodity which may be purchased by one party from

another in order to inflict further punishment and discomfort upon a debtor."  Id. at 964, 965.

12

Consequently, a creditor who has purchased a claim for an improper purpose, such as harassing the debtor, does not have standing to object to discharge.  Id. at 965.

In a later case, the B.A.P. reiterated its position.  In Ota v. Samsung Electronics Co., Ltd. (In re Ota), 192 B.R. 545 (B.A.P. 9th Cir. 1996), the debtor owed money to a supplier and that supplier owed money to Samsung.  When the supplier began having financial difficulties, it satisfied its debt to Samsung by assigning its claim against the debtor to Samsung.  The assignment occurred prepetition.  Id. at 546-47.  After the debtor filed a bankruptcy petition, Samsung objected to discharge.  The debtor argued that assignees of claims have no standing to object.  Id. at 547.  The court disagreed, holding  that "absent an improper purpose or motive, an assignee or purchaser of claims has standing to object to a debtor's discharge."  Id. at 549.

Although the creditor in Ota was a prepetition assignee and the creditor in Beugen was a postpetition assignee, the determinative factor in both cases was the motive of the creditor, not the timing of the assignment.  If the debtor is unable to demonstrate that the assignee had an improper purpose for acquiring the claim, then the assignee steps into the shoes of the assignor. In re Geriatrics Nursing Home, Inc., 195 B.R. 34, 38 (Bankr. D.N.J. 1996).  "Neither the Bankruptcy Code nor the Bankruptcy Rules restrict the ability of an assignee to assert all the rights of a creditor."  Id. at 38.

In this case, there is no evidence that Plaintiff purchased the claim of Security Bank for the purpose of harassing Defendants.  On the contrary, she has endeavored to help Defendants financially and only purchased the claim to prevent the imminent foreclosure of her house.  Even when Defendant-wife had disappeared from Plaintiff's life, Plaintiff retrieved Defendant-wife's property from Ms. Nichols' trailer to spare Defendant-wife from a threatened lawsuit.  That

action occurred about the same time Plaintiff purchased the Security Bank note.  Based on the

circumstances, the Court is persuaded that Plaintiff had no improper purpose for bringing this

suit and, thus, there is no basis for limiting Plaintiff's right as a creditor to object to discharge.

OBJECTION TO DISCHARGE

Plaintiff has objected to discharge of Defendants under four subsections of 11 U.S.C. §

727(a), which provides in relevant part as follows:

> (a) The court shall grant the debtor a discharge, unless—
> ...
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
> (A) property of the debtor, within one year before the date of the filing of the petition; or
> (B) property of the estate, after the date of the filing of the petition;
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
> (4) the debtor knowingly and fraudulently, in or in connection with the case—
> (A) made a false oath or account;
> (B) presented or used a false claim;
> (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
> (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;
> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]

14

11 U.S.C. § 727(a)(2)-(5).  The Court should construe these provisions liberally in favor of the

debtor to preserve the policy of allowing the honest but unfortunate debtor a fresh start.

Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 304 (11th Cir. 1994); Royer v. Smith (In re

Smith), 278 B.R. 253, 257 (Bankr. M.D. Ga. 2001) (Walker, J.).  "'The reasons for denying a

discharge ... must be real and substantial, not merely technical and conjectural.'" Miller, 39 F.3d

at 304 (quoting In re Tully, 818 F.2d 106, 110 (1st Cir. 1987)).


### Section 727(a)(2) - Fraudulent transfer of property

To establish a case for transfer of property with intent to hinder, delay, or defraud a

creditor, Plaintiff must show four elements:

> – that the act complained of was done within the one year before
> the date of the filing of the petition;
> – that the act was done with actual intent to hinder, delay or
> defraud a creditor or an officer of the estate charged with custody
> of property under the Bankruptcy Code;
> – that the act was that of the debtor or a duly authorized agent of
> the debtor; [and]
> – that the act consisted of transferring, removing, destroying or
> concealing any of the debtor's property, or permitting any of these
> acts to be done.

6 Collier on Bankruptcy ¶ 727.02[1] (15th ed. rev'd 2006).

At trial, Plaintiff argued that the transfer of property occurred when Defendants allowed

their mobile home to be repossessed while it contained equipment from the salon.  Although

Plaintiff offered no evidence of the exact date the mobile home was repossessed, according to

Defendant-wife's testimony, it had not yet been repossessed in early spring of 2005.  Thus, the

"transfer" took place within a year of the bankruptcy filing on August 10, 2005.  However,

15

Plaintiff has not provided evidence to establish all of the remaining elements.

Defendants must have had actual, intent to hinder, delay, or defraud a creditor; "constructive fraud is insufficient." Miller, 39 F.3d at 306. Based on the credible, undisputed testimony of Defendants, the Court concludes that they were merely trying to survive a time of extreme turmoil. Defendant-wife left the mobile home because the electricity was turned off. She did try to return at a later date prior to the repossession but was unable to gain access to the mobile home because the mobile home park manager had changed the locks and accused her of trespassing. The Court concludes that Defendants' actions were driven by the break up of their marriage and their precarious finances. The equipment was left in the mobile home not for the purpose of defrauding creditors but because Defendants had nowhere else to store it when they each moved out of the mobile home.

With regard to the transfer or removal of Defendants' property by Defendants or their agent, there is no question that the equipment was property of Defendants and that it disappeared. However, Plaintiff has not alleged that the mortgage company that repossessed the mobile home along with its content was an agent of Defendants, nor is there any evidence to establish such a fact. It is true that Defendant-wife consented to the repossession, but she also unsuccessfully tried to reenter the home prior to the repossession. Furthermore, the Court has some evidence before it that the mobile home park manager rather than the mortgage company was responsible for the disappearance of the equipment, which Defendant-wife only learned about long after it occurred. Because Plaintiff has failed to prove each element of transfer with intent to defraud creditors, the Court will enter judgment for Defendants on this claim.

16

*Section 727(a)(3) - Failure to keep or preserve financial records*

To prevail on a § 727(a)(3) claim, Plaintiff must prove: "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." Meridian Bank v. Alten (In re Alten), 958 F.2d 1226, 1232 (3d Cir. 1992). Once Plaintiff has proved her prima facie case, the burden shifts to Defendants to justify the failure. Johnson v. Greene (In re Greene), 340 B.R. 93, 98 (Bankr. M.D. Fla. 2006). "The purpose of section 727(a)(3) is to give creditors and the bankruptcy court complete and accurate information concerning the status of the debtor's affairs and to test the completeness of the disclosure requisite to a discharge." Alten, 958 F.2d at 1230 (citations omitted).

In this case, the Court has evidence that Defendant-wife kept comprehensive records relating to the Hair Force, including an appointment book detailing all services provided and product sold, invoices for inventory and equipment purchases, check stubs and checkbook register recording all outflow, and cash register tapes recording all inflow. However, all those records are missing or otherwise unavailable. The only records relating to the salon's finances available for scrutiny are Defendant-wife's income tax returns, cancelled checks, and miscellaneous receipts.

Assuming the available records are insufficient to determine Defendants' financial condition, the Court must determine whether any circumstances exist that justify the failure to retain adequate financial records. Defendant-wife testified that she intended to keep the records as long as possible, and her actions bear out her words. She did not throw the records away or destroy them. She stored the appointment book in her home and the other records in Haley

17

Nichols' shed.  She had no reason to believe that either location would be any less secure than,

for example, a self-storage facility or Plaintiff's home.  Nor did she have any reason to believe

that she would be denied access to either location.  However, she was locked out of her mobile

home before it was repossessed and avoided by Ms. Nichols.  Sandra has made multiple efforts

to contact Ms. Nichols including calling her cell phone and work phone and going to her place of

employment; all were futile.  In these circumstances, the Court finds the failure to preserve

records is justified and will enter judgment for Defendants on this claim.

### *Section 727(a)(4) - Knowingly and fraudulently making a false oath*

To prove a claim under § 727(a)(4), Plaintiff must demonstrate that "the debtor

knowingly made [a] false statement with the specific intent to defraud."  Bank of Miami v.

Espino (In re Espino), 806 F.2d 1001, 1002 (11th Cir. 1986).  "[A] false statement resulting from

ignorance or carelessness is not one that is knowing and fraudulent."  6 Collier on Bankruptcy ¶

727.04[1][a] (15th ed. rev'd 2006).  Although the false oath need not be detrimental to creditors

to result in denial of discharge, its subject matter must be material.  Chalik v. Moorefield (In re

Chalik), 748 F.2d 616, 618 (11th Cir. 1984).  It is material  "if it bears a relationship to the

bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings,

or the existence and disposition of his property."  Id.

In Chalik, the debtor failed to list his interest in at least five corporations that had assets

in excess of $2 million.  The debtor only disclosed this information upon specific questioning by

the trustee.  Id. at 619.  The court pointed out that even if the debtor's interests in the

corporations were worthless, "the bankruptcy court could reasonably infer that Chalik omitted

information necessary to determining his financial condition."  Id.  Plaintiff in this case relies on

18

_Chalik_ to argue that even if Defendants' false oaths resulted in no detriment to creditors, they are

sufficiently material to bar discharge.

The false oaths at issue are the errors and omissions in Defendants' bankruptcy schedules,

including the following:

- omission of $170 loan to Defendant-husband from Ms. Jones;
- omission of $850 loan to Defendant-husband from his boss, which was repaid postpetition;
- insufficient identification of digital camera, Playstation console, camcorder, and go-cart;
- omission of one of four computers;
- omission of salon management software installed on a computer;
- incorrect 2003 and 2004 gross income listed for Defendant-wife;
- omission of salon burglary and mobile home repossession from original statement of financial affairs (both were included in amendment);
- omission of date Defendants paid their bankruptcy attorney;
- omission of sale of four guns from original statement of financial affairs, and omission of one gun sale from amended statement of financial affairs;
- omission of address changes in the two years preceding the bankruptcy filing;
- incorrect address given for the Paradygm salon;
- incomplete list in original statement of financial affairs of people who had kept or supervised business records, which was expanded in amendment; and
- omission of the location or custodian of business records and inventory.

The Court is not persuaded that these errors, either individually or cumulatively, are

material or that they were made knowingly and fraudulently.  Defendants both testified that they

believed their schedules to be true and correct and that any errors were rectified by amendments.

The Court finds this testimony credible as well as their explanations for the various errors.  The

circumstances in this case are not analogous to _Chalik_.  Defendants did not omit a substantial

interest on the ground that it was valueless.  Instead, many of the errors are simply a result of

Defendants' lack of a basic understanding of financial terminology, minor oversights, or the lack

of hands-on assistance from their bankruptcy attorney while filling out the schedules.  As the

court in Caldwell v. Horton (In re Horton), 252 B.R. 245 (Bankr. S.D. Ga. 2000) (Walker, J.),

stated, "Property forgotten for its inconsequential value is easily distinguishable from property

purposefully omitted."  Id. at 247.

In Horton, the court denied discharge because, while testifying about omitted property,

the debtor "reveal[ed] a mental process replete with subtleties and fine distinctions, all aimed in a

direction opposite to full disclosure."  Id. at 246.  The court was particularly troubled by the

debtor's admission that he had concealed the existence of a shotgun from his attorney because he

believed the gun could not be "traced" to him.  Id.  The case ultimately turned on the court's

determination that the debtor's explanations lacked credibility.  Id. at 248.  See also Bank of

Dawson v. Cutts (In re Cutts), 233 B.R. 563, 572 (Bankr. M.D. Ga. 1999) (Walker, J.) (allowing

discharge after finding that the debtor's explanation for numerous omissions was credible).

As in Horton and Cutts, the Court had an opportunity to assess Defendants' demeanor

and credibility while they explained the reasons for the errors in their schedules.  The Court is

persuaded that the inaccuracies were the result of confusion, ignorance, and carelessness.

Consequently, the Court cannot find that they were made knowingly and fraudulently and will

enter judgment for Defendants on this claim.

### *Section 727(a)(5) - Failure to give satisfactory explanation for loss of assets*

In a § 727(a)(5) claim, the plaintiff is required to show a loss of assets.  Hawley v.

Cement Ind., Inc. (In re Hawley), 51 F.3d 246, 249 (11th Cir. 1995).  The burden then shifts to

the debtor to give a satisfactory explanation of the loss. Id. "To be satisfactory, 'an explanation'

must convince the judge. Vague and indefinite explanations of losses that are based upon

estimates uncorroborated by documentation are unsatisfactory." Chalik, 748 F.2d at 619

(internal citations omitted).

In this case, Plaintiff proved that with the exception of a washer and dryer and some small

tools, such as combs and scissors, nearly all the salon's equipment was unaccounted for.

However, Defendant-wife fully explained the losses in her trial testimony. Some of the

equipment had been stored in her mobile home. It was lost when the mobile home was

repossessed–either with the repossession or when Mr. Dixon removed the property and set it on

the side of the road. The remaining equipment was stored in a shed on the property of

Defendant-wife's friend. When the friendship ended postpetition, Defendant-wife was unable to

retrieve the property and cannot say whether or not it is still in the shed. The Court finds this

explanation satisfactory because Defendant-wife provided the exact last known location of the

equipment and explained why she has been unable to take possession of it. Therefore, the Court

will enter judgment for Defendants on this claim.

CONCLUSION

After considering the evidence and the arguments of the parties, the Court finds no basis

for denying Defendants a discharge. Therefore, the Court will enter judgment for Defendants on

all counts of Plaintiff's complaint.

An Order in accordance with this Opinion will be entered on this date.

END OF DOCUMENT